**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

LAKESIDE VISTA : 
APARTMENTS, L.P., : 
  : 
    Plaintiff, : 
  : CIVIL ACTION NO.
v. : 1:09-CV-3136-RWS
  : 
FEDERAL NATIONAL : 
MORTGAGE ASSOCIATION, *et* : 
*al.*, : 
  : 
    Defendants. : 
  : 

## ORDER

This case comes before the Court on Plaintiff's Motion to

Amend/Supplement the Complaint ("Motion to Amend") [18], and Defendants'

Motion for Summary Judgment [20].  After reviewing the record, the Court

enters the following order.

### Background[1]

---

[1] A large portion of the background section is taken directly from Defendants'
Concise Statement of Material Undisputed Facts [20-3] as set forth in Defendants'
Memorandum of Law in Support of Their Motion for Summary Judgment [20-2].
Plaintiff failed to submit a response to Defendants' Statement of Undisputed Facts as
required by Local Rule 56(B)(2).  Because Plaintiff failed to "directly refute[] the
movant's fact[s] with concise responses supported by specific citations to evidence,"
the "Court will deem each of the movant's facts as admitted."  L.R. 56(B)(2)(a)(2),

Plaintiff, Lakeside Vista Apartments, L.P. ("Lakeside"), is a Georgia limited partnership created for the purpose of holding Lakeside Vista Apartments ("Property"), a multifamily complex located in Kennesaw, Georgia. (Def.'s Concise Statement of Material Undisputed Facts ("DF"), Dkt. No. [20-3] at ¶¶ 1-2.  The Property was financed by $22,000,000 in housing revenue bonds ("the bonds").  (Id. at ¶ 3).  ARCS Commercial Mortgage Co., L.P, subsequently acquired by Defendant PNC Bank, was the loan servicer for the transaction. (Id. at ¶ 4).  The bonds were issued pursuant to a Trust Indenture between the Kennesaw Development Authority and U.S. Bank, as trustee. (Id. at ¶ 5).  At Lakeside's request, the Federal National Mortgage Association ("Fannie Mae") executed and delivered a Direct Pay Irrevocable Transferable Credit Enhancement Instrument for the benefit of the trustee pursuant to which Fannie Mae agreed to provide credit enhancement for the bonds.  (Id. at ¶ 6).  Lakeside executed and delivered to Fannie Mae a Reimbursement Agreement, pursuant to which Lakeside agreed to reimburse Fannie Mae, for among other things, any payments by Fannie Mae under the Reimbursement Agreement.  (Id. at ¶ 9).

At the time of the original underwriting the maximum loan supported by

_____

N.D. Ga.

AO 72A
(Rev.8/82)

the Property was $20,000,000.  (<u>Id.</u> at ¶ 12).  Fannie Mae agreed to credit

enhance the full issuance of $22,000,000 in tax exempt bonds during the

construction period with a potential for the borrower to earn out, or achieve, the

$2,000,000 differential at the time of conversion to the permanent loan phase.

(<u>Id.</u> at ¶ 13).  The Fannie Mae commitment was issued on June 25, 2004 for a

term of 30 months, but multiple extensions were granted, extending the

termination date to April 15, 2008. (<u>Id.</u> at ¶¶ 14-16).

     The Property converted to permanent financing in April 2008.  (<u>Id.</u> at ¶

18).  Fannie Mae allowed the property to convert with a reduced debt service

coverage ratio to accommodate Lakeside and to preserve the bonds.  (<u>Id.</u> at ¶

19).  As a condition of Fannie Mae providing credit enhancement at conversion

and permitting a reduced debt service coverage ratio, Lakeside was required to

deliver to Fannie Mae a letter of credit as additional collateral for the loan.

(<u>Id.</u> at ¶ 21).

     On April 15, 2008, Fannie Mae and Lakeside entered into an

Achievement Agreement.   (<u>Id.</u> at ¶ 24).  PNC ARCS LLC (now known as PNC

Multifamily Mortgage LLC) acted as servicer of the loan on behalf of Fannie

Mae.  (<u>Id.</u> at ¶ 25).  The Achievement Agreement was put in place to allow

Lakeside to achieve a 1.20 debt service coverage ratio within 18 months of

conversion.  (Id. at ¶ 26).  At the time of the Achievement Agreement, the loan

amount achievable at a 1.20 debt service coverage ratio was $19,890,000.

(Id. at ¶ 28).  The difference between this and the maximum loan amount

available at that time was $1,820,000.  (Id. at ¶ 29).  Fee maintenance on the

$1,820,000 potential maximum pay down amount was 8.5% or 154,700.  (Id. at

¶ 30).  The letter of credit that the Achievement Agreement required from

Lakeside was for $1,974,700, accounting for the $1,820,000 difference and the

prepayment premium of $154,700.  (Id. at ¶ 31).

Lakeside secured from Compass Bank a letter of credit for $1,974,700

valid for one year.  The letter of credit was originally set to expire on April 10,

2009, but Lakeside renewed the letter of credit until April 2010.  In March

2009, Lakeside started communicating with Defendants about satisfying the

requirements of the Achievement Agreement.  (Id. at ¶ 34).  The Achievement

Agreement permitted Fannie Mae to return the letter of credit only if Lakeside

met specific conditions.  (Id. at ¶ 45).  The conditions set forth in the

Achievement Agreement were not modified by any of the communication

between Plaintiff and Defendants.  (Id. at ¶ 39).[2]

_____

[2] Plaintiff appears to assert that a March 24, 2009 email from PNC Bank to
Plaintiff's property manager modified the terms of the Achievement Agreement.
However, Section 20 of the Achievement Agreement states that "no change or

Lakeside was entitled to a return of the letter of credit if it was able to meet specific conditions.  (Id. at ¶ 45).  Specifically, section 5(i) of the Achievement Agreement, states in relevant part, that "[Lakeside] and [Fannie Mae] agree that the Letter of Credit, and the proceeds of any draws on such Letter of Credit, shall not be returned until such time as the Property achieves a 1.20 debt service coverage for 90 days with an annual lookback . . . ."  (Id. at ¶ 46).  If the conditions were not met, then section 5(k) of the Achievement Agreement allowed Fannie Mae to draw on the letter of credit.  (Id. at ¶ 47).  Section 5(k) states:

> Notwithstanding anything to the contrary contained in this Agreement, Borrower and Credit Enhancer agree that in the event a reduction in the Permanent Phase Loan is required at the end of the Achievement Period, as a result of failure to achieve a debt service coverage of 1.20.  Credit Enhancer shall fully draw on the Letter of Credit and, without Borrower's consent, Credit Enhancer shall apply the proceeds of the Letter of Credit to reduce the loan amount.  Credit Enhancer shall make its determination as to whether a reduction in the loan amount is required at the end of the Achievement Period.

Section 5 of the Achievement Agreement also explains the calculation necessary to determine whether Lakeside has satisfied the 1.20 debt service coverage ratio.  (Id. at ¶ 49).

---

amendment [to the Agreement] shall be recognized as valid unless it is made in writing and executed by the parties to this Agreement."

On September 22, 2009, Lakeside made a request to determine whether it had met the 1.20 debt service coverage ratio necessary for the return of the letter of credit.  Section 5(b) of the Achievement Agreement states in relevant part that:

> [Fannie Mae] shall makes its determination as set forth in Section 5 after receipt of a request by [Lakeside] . . . . In addition to the calculations to be made pursuant to Sections 5(c) and (d) below, [Fannie Mae's] determination of any reduction or cancellation of the Letter of Credit . . . shall be subject to a satisfactory review by [Fannie Mae] of the following: (i) the certified rent roll; (ii) a physical inspection of the Property; (iii) the general management and operations of the Property; and (iv) such other information, due diligence or inspections that [Fanne Mae] shall require in order to determine or verify income, expenses, vacancies, collection loss and concession information.

The formula includes a calculation of

> actual annualized effective gross income from the Property's most recent 90-day period shown on the financial statement for the Statement Period . . . as reduced by [Fannie Mae] to exclude any unusual type of income (e.g., temporary or nonrecurring income) and include only income consistent with the type of income included in [Fannie Mae's] underwriting of the Conversion of the Loan . . . .

(Achievement Agreement at § 5(c)(i)).  The formula to determine the debt service coverage ratio also includes a calculation of

> adjusted net income by deducting from the income amount determined in Section 5(c)(i) the amount of annualized expenses for the most recent 90-day period . . . adjusted by [Fannie Mae] to (A) trend the expenses from the period covered by the Statement Period, and (B) reflect the stabilized operations of the Property, as

6

> determined by [Fannie Mae] in its discretion . . . . [Fannie Mae] shall not consider atypical, nonrecurring expenses as indicative of stabilized operations. Any expense adjustment as determined by [Fannie Mae] may result in a line item which may be more or less than the actual annual expenses for the line item for that Statement Period.

(Id. at Section 5(c)(ii)). Furthermore, in making these determinations, the

Achievement Agreement provides that,

> [Lakeside] agrees that [Fannie Mae] may use its discretion in making its determination as to any matters set forth in this Section 5 or in determining any of the adjustments to income or expenses to be made in making the calculations described in this Section 5, and that all determinations and calculations in this Section 5 necessarily involve [Fannie Mae's] use of [Fannie Mae's] business judgment.

(Id. at Section 5(h)).

After reviewing the July 2008 - July 2009 trend reports, including August operations data, Defendants applied the formula as set forth in the Achievement Agreement as described above.[3] (DF at ¶ 58). In the calculation performed by Fannie Mae, Lakeside did not achieve a debt service coverage ratio of 1.20 for June 2009, July 2009, or August 2009.[4] (Id. at ¶ 58). In applying the formula

_____

[3] The calculations are found in Exhibit D to the Declaration of Susan Ussery. (Dkt. No. [20-8]).

[4] According to Fannie Mae's calculations the debt service coverage ratio was 0.88 in June 2009, 0.87 in July 2009, and 0.96 in August 2009. (DF at ¶ 58).

7

set forth in the Achievement Agreement, Defendants reduced from the "Other Income" both the "Miscellaneous" and "Termination Fee" income that Lakeside reported in May 2009, June 2009, July 2009, and August 2009, as allowed by the terms of the Achievement Agreement, because they were unusual and not consistent with the type of income included in Fannie Mae's underwriting of the Conversion of the Loan.[5]  (Id. at ¶ 62).

On December 8, 2009, Lakeside filed a Motion for Preliminary Injunction [11] seeking to prevent Fannie Mae from cashing the letter of credit. After receiving oral argument and reviewing the record, the Court issued an Order [16] denying Lakeside's Motion for Preliminary Injunction [11].  The Court determined that:

> In calculating whether the Property achieved a 1.20 debt service coverage, Defendants discounted reported income in certain categories that was grossly higher than had been reported

_____

[5] From December 2007 to May 2009, Lakeside had never reported more than $668 in "Miscellaneous" "Other Income" and often reported $0.  (DF at ¶ 59). However, Lakeside reported for "Miscellaneous" "Other Income" $16,196 in June 2009, $25,619 in July 2009, and $25,119 in August 2009.  (Id.).  This category of income had dramatically increased in this period from the usual amount reported by Lakeside.

Similarly, from December 2007 to May 2009, Lakeside had never reported more than $5,861 in "Termination Fees" "Other Income" and sometimes reported $0. (Id. at 60).  However, Lakeside reported for "Termination Fees" "Other Income" $11,193 in June 2009, $18,662 in July 2009, and $4,500 in August 2009.  This category of income also shows unusually high values during this period.  (Id.)

> previously.  In their Response to Plaintiff's Motion [12] and at the
> hearing, Defendants provided sufficient justification for
> discounting the reported income figures.  It is clear that such
> discounting was not arbitrary or capricious and fell within the
> discretion given to Defendants by Section 5(h) of the Achievement
> Agreement.  Based upon the discounted income figures, the
> Property did not meet the necessary debt service coverage for the
> return of the [letter of credit].  (See Lakeside Vista Trend Report,
> Exhibit B to Affidavit of Susan Ussery [[Dkt. No.] [12-4]]).

(Order of Dec. 17, 2009, Dkt. No. [16] at 3-4).

On or about December 29, 2009, Defendants cashed the letter of credit,

and pursuant to Section 9(b) of the Achievement Agreement, placed the

proceeds in a general corporate account.  (Brief in Support of Motion to

Amend, Dkt. No. [18-1] at 6; DF at ¶ 64).  Plaintiff asserts that "[a]s of March

29, 2010, the Defendants have not applied any part of the proceeds of the letter

of credit to pay down the loan on the Project, and the Plaintiff has been forced

to pay interest on the entire loan balance."  (Response to Mot. for Summary

Judgment, Dkt. No. [24] at 8).  Defendants claim that they have "repeatedly

attempted to negotiate in good faith with Lakeside to determine the best way to

apply the proceeds of the Letter of Credit and resolve the litigation (including

all issues surrounding attorneys' fees and expenses and the Termination Fee)."

(DF at ¶ 65).  Defendants sent Plaintiff two demand letters for payment of legal

fees and costs accrued by Fannie Mae in this action, which by March 26, 2010

amounted to $101,582.97.  (Ex. H to Response to Mot. for Summary Judgment, Dkt. No. [24-8]).

Plaintiff alleges that Section 5(k) of the Achievement Agreement requires Defendants to apply all of the proceeds of the letter of credit to the outstanding loan balance, but that Defendants instead have "unilaterally modified that approach and want to deduct fees and expenses from the Letter of Credit proceeds before reducing the loan balance."  (Brief in Support of Motion to Amend, Dkt. No. [18-1] at 7, 8).  Defendants respond that they "plan to apply the loan proceeds in accordance with the terms of the [documents governing the loan, including the] Multifamily Note, the Reimbursement Agreement, and the Achievement Agreement." (Response to Motion to Amend, Dkt. No. [19] at 4). The Reimbursement Agreement states that Lakeside "shall pay a Termination Fee . . . to the Loan Servicer for remittance to Fannie Mae if during the Termination Fee Period . . . the loan is prepaid . . . in whole . . . or in part."[6] (Reimbursement Agreement, Ex. B. to Dec. of Susan Ussery, Dkt. No. [20-6] at § 4.4(a)(1)).  The Reimbursement Agreement sets forth the formula for

---

[6] See also Reimbursement Agreement at § 4(c) ("If [Fannie Mae] for any reason, shall permit the proceeds of the Letter of Credit to be applied to payment of a portion of the principal amount of the Note, a prepayment premium attributable to such prepaid principal amount shall be due to [Fannie Mae] as provided in the Note.").

calculating the termination fee, which is arrived at by multiplying the principal

amount being prepaid by 8.00 percent, the percentage applicable to loan

prepayment in the second year.  (Id. at § 4.4; DF at ¶ 69).  Defendants note that

the amount of the letter of credit included a "prepayment premium of

$154,700.00."  (Achievement Agreement at § 1).  The agreements between

Lakeside and Defendants also require Lakeside to pay "all costs and expenses

incurred by [Fannie Mae] . . . in exercising any of [Fannie Mae's rights or

obligations pursuant to the terms of [the Achievement] Agreement."

(Achievement Agreement at § 15(b); see also Reimbursement Agreement at §

4.6(b); Multifamily Note, Ex. A to Dec. of Susan Ussery, Dkt. No. [20-4] at §

12).

        Plaintiff has sought to amend its Complaint and Defendants have sought

to dismiss Plaintiff's original Complaint.  The Court now addresses these

pending motions.

## I.      Plaintiff's Motion to Amend Complaint [18]

        Plaintiff seeks leave of the Court to file an amended complaint.  (See

Proposed Amended Complaint, Ex. A to Mot. to Amend Complaint, Dkt. No.

[18-2]).  Plaintiff's proposed amended complaint seeks to supplement the

earlier complaint to include causes of action arising from Defendants' draw on the letter of credit and failure to apply the proceeds to Plaintiff's outstanding loan balance.  Plaintiff's original Complaint [1-2] alleged a cause of action for breach of contract arising from Defendants' failure to return the letter of credit (Count III).  Plaintiff seeks to assert a new claim for breach of contract in the proposed amended complaint, alleging that Fannie Mae "deliberately breached the Achievement Agreement by failing and refusing to apply the proceeds of the Letter of Credit to reduce the loan amount as required."  (Proposed Amended Complaint at ¶ 32).  In the original Complaint, Plaintiff asserted a cause of action for conversion based upon Defendants exercise of dominion and control over the letter of credit.  In the Proposed Amended Complaint, Plaintiff has altered the conversion claim from one based upon Defendants' control over the letter of credit, to one based upon Defendants' control over the proceeds of the letter of credit.[7]  (Proposed Amended Complaint at ¶ 37).  The Proposed Amended Complaint eliminates the request for a temporary restraining order

---

[7] "Defendants acting in conspiracy, have wrongfully exercised dominion and control over Plaintiff's property, i.e., the proceeds of Plaintiff's Letter of Credit, to the exclusion of Plaintiff by cashing the Letter of Credit, refusing to apply the proceeds to reduce the loan amount, and keeping the proceeds for their own benefit, all in violation of the Achievement Agreement, as amended."  (Proposed Amended Complaint at ¶ 37).

AO 72A
(Rev.8/82)

(Count I) and an interlocutory injunction (Count II) and causes of action based on conspiracy (Count V) and Georgia's RICO Act (Count VI) found in the original Complaint.  The Proposed Amended Complaint also eliminates Joseph Briganti, a vice president of PNC Bank, as a Defendant.

Rule 15 of the Federal Rules of Civil Procedure allows a plaintiff to amend its complaint after the opposing party files a responsive pleading either with the opposing party's written consent or the court's leave.  Rule 15 directs this Court to "freely give leave when justice so requires."  Plaintiff contends that justice requires the grant of their application for leave.  (Pl.'s Brief in Support of Mot. to Amend at 10).  Plaintiff seeks to allege acts that occurred after the filing of their original Complaint, and maintains that it has promptly sought to amend its Complaint after Defendants announced their intent to make deductions from the proceeds of the letter of credit.  Defendants respond that leave to amend should not be automatically granted, particularly, as they assert is the case in this instance, the amendment would be futile.  (Response to Mot. to Amend, Dkt. No. [19] at 2-3 (citing O'Brien v. Union Oil Co., 699 F. Supp. 1562, 1571 (N.D. Ga. 1988) ("the granting of such a motion is by no means automatic"); Burger King Corp. v. C.R. Weaver, 169 F.3d 1310, 1320 (11th Cir.

1999) (denial of leave to amend is justified by futility when the "complaint as amended is still subject to dismissal")).  Defendants maintain that they will apply the proceeds of the letter of credit according to the terms of the Achievement Agreement, Reimbursement Agreement, and Multifamily Note. (Response to Mot. to Amend at 4).

Section 5(k) of the Achievement Agreement states:

> Notwithstanding anything to the contrary contained in this Agreement, Borrower and Credit Enhancer agree that in the event a reduction in the Permanent Phase Loan is required at the end of the Achievement Period, as a result of failure to achieve a debt service coverage of 1.20.  *Credit Enhancer shall fully draw on the Letter of Credit and, without Borrower's consent, Credit Enhancer shall apply the proceeds of the Letter of Credit to reduce the loan amount.*

(emphasis added).  Defendants correctly note that the amount of the letter of credit was increased by $154,700 to include a prepayment premium and that the Reimbursement Agreement states that Lakeside shall pay a termination fee for early prepayment of the loan.  Defendants also correctly note that provisions of the applicable agreements require Lakeside to pay costs and expenses incurred by Defendants in exercising rights granted by the agreements.  However, Defendants have failed to point to any section of the Achievement Agreement, Multifamily Note, or Reimbursement Agreement that would allow them to

14

maintain possession over the entirety of the proceeds in light of the directive of Section 5(k) that "Credit Enhancer shall apply the proceeds of the Letter of Credit to reduce the loan amount."  Even assuming that Section 5(k) does not require Defendants to fully apply the proceeds of the letter of credit to reduce the loan amount, allowing them to retain the amount required to pay the termination fee, there is still a large sum of money that should have been applied to pay down the loan.  The letter of credit was for $1,974,700.  Even assuming that Defendants are entitled to the full prepayment premium of $154,700 included in the letter of credit, there still remains $1,820,000 that could be used to pay down the loan balance, but currently remains in a general corporate account controlled by Defendants.  Also, while Lakeside is obligated to pay some amount in costs and expenses, Defendants have not identified any section of the applicable agreements that indicates that this amount is to be deducted from the proceeds of the letter of credit before applying the proceeds to the loan balance.

Therefore, Defendants have not demonstrated that Plaintiff's Proposed Amended Complaint would be futile.  Plaintiff's Motion to Amend [18] is

**GRANTED**.  Exhibit 1 to Plaintiff's Motion to Amend [18] shall be deemed filed as Plaintiff's Amended Complaint on the date of this Order.

## II.   Defendants' Motion for Summary Judgment [20]

Defendants' Motion for Summary Judgment [20] is directed towards Plaintiff's original Complaint.  Defendants assert that "[a]ll of the claims in Plaintiff's Complaint center on Defendants' rightful refusal to release the Letter of Credit."  (Memo in Support of Motion for Summary Judgment, Dkt. No. [20-2] at 2).  The Amended Complaint has eliminated some causes of action, added an additional cause of action for breach of contract for retaining the proceeds of the letter of credit, and amended the cause of action for conversion.  To the extent that Defendants' Motion [20] address claims that Plaintiff reasserts in its Amended Complaint, it is not rendered moot.  To the extent it addresses claims not present in the Amended Complaint, it is moot.

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

16

judgment as a matter of law." FED. R. CIV. P. 56(c).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

17

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

B.     Plaintiff's Claims

The Amended Complaint realleges Count III from the original Complaint as Count I in the Amended Complaint, asserting a cause of action for breach of

contract for failure to return the letter of credit.   In denying Plaintiff's Motion

for Preliminary Injunction [11], the Court noted:

> In calculating whether the Property achieved a 1.20 debt service
> coverage, Defendants discounted reported income in certain
> categories that was grossly higher than had been reported
> previously.  In their Response to Plaintiff's Motion [12] and at the
> hearing, *Defendants provided sufficient justification for*
> *discounting the reported income figures.  It is clear that such*
> *discounting was not arbitrary or capricious and fell within the*
> *discretion given to Defendants by Section 5(h) of the Achievement*
> *Agreement.*  Based upon the discounted income figures, the
> Property did not meet the necessary debt service coverage for the
> return of the [letter of credit].

(Order of Dec. 17, 2009, Dkt. No. [16] at 3-4 (emphasis added)).  Even at this

later date, drawing all reasonable inferences in the light most favorable to

Plaintiff, there is no genuine issue as to any material fact in regards to

Plaintiff's claim for breach of contract based on Defendants' failure to return

the letter of credit.  Therefore, Defendants are entitled to judgment as a matter

of law as to Count I of Plaintiff's Amended Complaint.

Section 5 of the Achievement Agreement governs Defendants calculation

of whether Plaintiff has met the debt service coverage ratio necessary for the

release of the letter of credit.  Section 5(h) states that Lakeside agrees to allow

Fannie Mae to use its discretion and business judgment in determining any

adjustments that should be made to income or expenses reported by Lakeside when calculating the debt service coverage ratio.  In calculating "annualized effective gross income" the Achievement Agreement states that Fannie Mae will reduce the income reported on Lakeside's financial statements "to exclude any unusual type of income (e.g., temporary or nonrecurring income)." (Achievement Agreement at § 5(c)(i)). Additionally, the Achievement Agreement also provided Fannie Mae with the discretion to adjust reported expenses to reflect stabilized operations, disregarding atypical or nonrecurring expenses.  (Id. at § 5(c)(ii)).   After reviewing the July 2008 - July 2009 trend reports, which included August operations data, Defendants applied the formula as set forth in the Achievement Agreement.[8]  (DF at ¶ 58).

In the calculation performed by Fannie Mae, Lakeside did not achieve a debt service coverage ratio of 1.20 for June 2009, July 2009, or August 2009.[9] (Id. at ¶ 58).  In applying the formula, Defendants reduced from the "Other Income" both the "Miscellaneous" and "Termination Fee" income that Lakeside reported in May 2009, June 2009, July 2009, and August 2009, as allowed by

---

[8] The calculations are found in Exhibit D to the Declaration of Susan Ussery. (Dkt. No. [20-8]).

[9] According to Fannie Mae's calculations the debt service coverage ratio was 0.88 in June 2009, 0.87 in July 2009, and 0.96 in August 2009.  (DF at ¶ 58).

AO 72A
(Rev.8/82)

the terms of the Achievement Agreement, because they were unusual and not consistent with the type of income included in Fannie Mae's underwriting of the Conversion of the Loan. (Id. at ¶ 62). From December 2007 to May 2009, Lakeside had never reported more than $668 in "Miscellaneous" "Other Income" and often reported $0. (DF at ¶ 59). However, Lakeside reported for "Miscellaneous" "Other Income" $16,196 in June 2009, $25,619 in July 2009, and $25,119 in August 2009. (Id.). This category of income had dramatically increased in this period from the usual amount reported by Lakeside. Similarly, from December 2007 to May 2009, Lakeside had never reported more than $5,861 in "Termination Fees" "Other Income" and sometimes reported $0. (Id. at 60). However, Lakeside reported for "Termination Fees" "Other Income" $11,193 in June 2009, $18,662 in July 2009, and $4,500 in August 2009. This category of income also shows unusually high values during this period. (Id.).

The Achievement Agreement clearly provided Fannie Mae with the authority to use appropriate discretion and business judgment to disregard unusual income in calculating the debt service coverage ratio. The income reported by Lakeside as "Miscellaneous" and "Termination Fees" for June, July, and August 2009, did not reflect normal stabilized operations. In

responding to Defendants' Motion for Summary Judgment, Plaintiff does not

explain why the reported income for the three months in question were

dramatically higher than previously reported or how Defendants went beyond

the authority given to them in the Achievement Agreement in discounting the

reported income.  Plaintiff has not met its burden of presenting affirmative

evidence to demonstrate that a genuine issue of material fact exists.  See

Anderson, 477 U.S. at 257.  Plaintiff does not point to any fact that would

indicate that Defendants did not act in good faith or acted arbitrarily and

capriciously in discounting the income reported as "Miscellaneous" and

"Termination Fees."  Therefore, there is no genuine issue as to any material fact

in regards to Plaintiff's claim for breach of contract based on Defendants'

failure to return the letter of credit.

Defendants' Motion for Summary Judgment [20] is: **GRANTED** as to

Count I of Plaintiff's Amended Complaint (Count III of the original

Complaint); **DENIED** as to Count III of the Amended Complaint, because the

conversion claim in the Amended Complaint is based upon the failure to apply

the proceeds of the letter of credit, not on the failure to release the letter of

credit as alleged in Count IV of the original Complaint; **DENIED** as to Counts

AO 72A
(Rev.8/82)

IV and V of the Amended Complaint (Counts VII and VIII, respectively, of the original Complaint), which set forth claims for punitive damages and attorney fees and expenses; and **DENIED**, **as moot**, as to Counts I, II, V, and VI of the original Complaint, which are not realleged in the Amended Complaint.

### Conclusion

For the aforementioned reasons, Plaintiff's Motion to Amend/Supplement the Complaint [18] is **GRANTED**.  Exhibit 1 to Plaintiff's Motion to Amend [18] shall be deemed filed as Plaintiff's Amended Complaint on the date of this Order.  Defendants' Motion for Summary Judgment [20] is **GRANTED**, **in part**, and **DENIED**, **in part**.  Count I of Plaintiff's Amended Complaint is **DISMISSED**.

**SO ORDERED**, this __29th__ day of June, 2010.

**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)